UNITED STATES BANKRUPTCY COURT                           **FOR PUBLICATION**

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

In re:

JAMES LINCOLN DUFFY,                           Chapter 7

                    Debtor.                    Case No. 04 B 23560 (ASH)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

JAMES LINCOLN DUFFY,

                    Plaintiff,

        -against-                              Adv. Proc. No. 04-08855A

LAURA MAYER TABACK,

                    Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**A P P E A R A N C E S :**

**SIDNEY TURNER, P.C.**
**Attorney for Debtor-Plaintiff**
**By: Sidney Turner, Esq.**
**Westchester Financial Center**
**11 Martine Avenue**
**White Plains, NY 10606**

**KITSON KITSON & BISESTO, LLP**
**Attorneys for Defendant**
**By: Patricia T. Bisesto, Esq.**
**    Theresa A. Girolamo, Esq.**
**50 Main Street, 9th Floor**
**New York, NY 10606**

**WILSON, ELSER, MOSKOWITZ,**
**  EDELMAN & DICKER**
**Attorneys for Defendant**
**By: David L. Tillem, Esq.**
**3 Gannett Drive**
**White Plains, NY 10604**

**ADLAI S. HARDIN, JR.**
**UNITED STATES BANKRUPTCY JUDGE**

**OPINION AFTER TRIAL**

Plaintiff-debtor James Lincoln Duffy ("debtor" or "Duffy") commenced this adversary proceeding against defendant Laura Mayer Taback ("Taback"), Duffy's ex-wife, in October 2004 seeking a determination of the dischargeability under Section 523(a)(5) and (15) of the Bankruptcy Code of a $74,000 debt remaining on a state court judgment of divorce requiring him to pay $240,000 in $2,000 monthly payments over ten years.

The adversary proceeding was tried to the Court without a jury. The following constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.

## Jurisdiction

The Court has jurisdiction of this adversary proceeding pursuant to 28 U.S.C. §§ 1334(a) and 157(a) and the standing order of referral to bankruptcy judges signed by Acting Chief Judge Robert J. Ward on July 10, 1984. This is a core proceeding under 28 U.S.C. § 157(b).

## Background

The parties were married in July 1984. They have two children born in 1986 and 1989. In 1993 Taback commenced a relationship with Sheldon Taback (whom she married shortly after the judgment of divorce ended her marriage to Duffy four years later) and asked the debtor to move out of the marital home, which he did. In 1994 she commenced an action for divorce. After several years of discovery, negotiations and delay, the divorce action came on for trial before the Honorable Fred Shapiro on June 27, 1997. At the instance and with the active participation of Justice Shapiro, the parties settled the single agreed issue of equitable distribution on which they went to trial. The judgment of divorce states as follows in relevant part:

> ADJUDGED AND DECREED that the Defendant [Duffy] shall pay monthly spousal maintenance to the Plaintiff [Taback] commencing July 1, 1997 in the sum of $2,000 per month payable in monthly installments which shall be made on the first day of each month for the term of ten (10) consecutive years, which payments shall be non-dischargeable in

bankruptcy and paid unconditionally to the Wife irrespective of her cohabitation or remarriage.

For several years following the 1997 judgment of divorce Duffy complied fully with his obligations to make the $2,000 monthly "spousal maintenance" payments referred to above, as well as his over $2,000 a month child support payments to Taback.

However, in May 2002 Duffy consented to relinquish his license to practice medicine because of certain allegations of professional misconduct. Duffy had been treated for depression during his high school and college years. Contemporaneous with the allegations of professional misconduct and his surrender of his medical license and profession, Duffy suffered further mental or emotional stress and disability (obsessive-compulsive disorder) which rendered him incapable of effectively defending himself against the charges of alleged misconduct, and thereafter from successfully pursuing a new career. Nevertheless, the trial record before me demonstrates Duffy's good faith in seeking to obtain new employment to support himself and honor his financial obligations.

As a consequence of the loss of his medical license and professional employment, Duffy was deprived of income and was no longer able to fulfill his obligations under the judgment of divorce. After exhausting his savings and retirement accounts, and having no other financial resources of his own, Duffy fell into arrears in his divorce judgment obligations.

In the spring of 2004 Taback moved in the state court for sanctions to enforce her rights under the divorce judgment. Although Duffy had no property, *de minimis* income barely sufficient to support himself[1] and no ability to pay the arrears, the state court nevertheless entered an order on May 26,

---

[1]   At the May 26, 2004 hearing on Taback's motion for sanctions, the state court judge said:

"I am also satisfied from our discussions that there is nothing to be gained in terms of a goal complying with the arrearages by a garnishment for a wage deduction order, nor am I satisfied that a money judgment would result in payment to those that are owed.

"Incarceration is only to be used as a last resort and then sparingly. I think under these circumstances, the remedy to be imposed by the Court is incarceration. . . ."   May 26, 2004

(continued...)

2004 requiring him to pay the sum of $42,600 on or before 11:00 A.M. June 1, 2004 on pain of

incarceration in the event that he failed to do so.[2]   Faced with debtor's prison, Duffy appealed to his

father, who thereupon paid the $42,600 to Taback, which the state court had referred to at the May 26,

2004 hearing as the "get out of jail free card, an automatic purge of the underlying contempt amount

[which] will result in an automatic release from incarceration."  May 26, 2004 Transcript at 30-3.  Still

unable to earn enough money to comply with his $2,000-plus a month child support and additional $2,000 a

month "spousal maintenance" payment obligations to Taback under the divorce judgment, Duffy once

again fell into arrears.   Faced with the prospect of further orders for sanctions and incarceration, Duffy

filed his voluntary petition under Chapter 7 of the Bankruptcy Code on October 12, 2004 and commenced

this adversary proceeding on October 29, 2004.

## **Discussion**

### **Section 523(a)(5)**

Section 523(a)(5) of the Bankruptcy Code excepts from discharge any debt

(5) to a spouse, former spouse, or child of the debtor, for alimony to, maintenance for, or
support of such spouse or child, in connection with a separation agreement, divorce decree
or other order of a court of record, determination made in accordance with State or
territorial law by a governmental unit, or property settlement agreement, but not to the
extent that —

(A) such debt is assigned to another entity, voluntarily, by operation of law, or
otherwise (other than debts assigned pursuant to section 408(a)(3) of the Social
Security Act, or any such debt which has been assigned to the Federal
Government or to a State or any political subdivision of such State); or

---

[1](...continued)
Transcript at 28-29.

[2]      The court said at the May 26, 2004 hearing:

"I have every reason to believe based upon out on the record and off the record
discussions, that there is a possibility that family money may be available here, although I
have no reason to think that it definitely would be available in this instance.  That may be
the best perhaps the only source that Dr. Duffy or Mr. Duffy . . . would be able to go to in
an effort to satisfy the arrearages."  *Id*. at 28.

(B) such debt includes a liability designated as alimony, maintenance, or support, unless such liability is actually in the nature of alimony, maintenance, or support;

The threshold issue which the Court must decide is whether the above-quoted provision of the divorce judgment requiring Duffy to pay $240,000 in $2,000 monthly installments over ten years constituted alimony/maintenance within the meaning of Section 523(a)(5) of the Bankruptcy Code. If those payments constitute alimony or maintenance for bankruptcy purposes, they are not dischargeable under the express terms of Section 523(a)(5), and that determination would resolve the adversary proceeding without more. If, on the other hand, those payments constitute equitable distribution of marital property for bankruptcy purposes, the issue would then arise whether the obligation is dischargeable under Section 523(a)(15).

Taback argues that the payments in question must be deemed to be alimony/ maintenance, and certain facts support that conclusion. The divorce judgment itself refers to the payments as "spousal maintenance," and Duffy consistently referred to the payments as "alimony" and he deducted the payments for tax purposes, which he could not do if they were designated as a property settlement.

But the law is clear that the question whether obligations under a divorce decree constitute alimony/maintenance within the meaning of Section 523(a)(5), or equitable distribution of marital property not within subsection (5), is a question of bankruptcy law to be decided by the bankruptcy court on the basis of all the facts and circumstances, and that the bankruptcy court may, indeed must, reject the characterization applied to the obligation by the divorce court or the parties if warranted by a consideration of all of the facts. Indeed, subsection (B) of Section 523(a)(5) expressly mandates that the exception in subsection (5) does *not* apply "to the extent that . . . (B) such debt includes a liability *designated* as alimony, maintenance, or support, *unless such liability is actually in the nature of alimony, maintenance, or support*" (emphasis supplied). The legislative history of Section 523(a)(5) confirms that the power of decision on this issue is vested in the bankruptcy court. H.R. REP. NO. 95-595, pp. 364

(1977) ("What constitutes alimony, maintenance, or support, will be determined under the bankruptcy laws, not State law.").

The case law universally follows the legislative mandate. *Bieluch v. Cook (In re Bieluch)*, 216 F.3d 1071 (table) (2d Cir. 2000) ("[A] bankruptcy court must make its own factual findings regarding the nature of a debt to a former spouse, but in doing so may consider the state court's characterization of the payment."); *Brody v. Brody (In re Brody)*, 3 F.3d 35, 38 (2d Cir. 1993) ("Although a written manifestation of agreement is persuasive evidence of intent, the label that the parties attach to a payment is not dispositive; the court must look to the substance, and not merely the form, of the payments." (internal citations omitted)); *Pauley v. Spong (In re Spong)*, 661 F.2d 6, 9 (2d Cir. 1981) ("[It is a] well established principle of bankruptcy law that dischargeability must be determined by the substance of the liability rather than the form."); *Biggs v. Biggs (In re Biggs)*, 907 F.2d 503, 505 (5th Cir. 1990) ("Congress specifically stated its intention that bankruptcy courts look not at the label a state court or the parties applied to a debt but instead at the purpose of the obligation."); *Kerzner v. Kerzner (In re Kerzner)*, 250 B.R. 487, 491 (Bankr. S.D.N.Y. 2000) ("An obligation's status as alimony, maintenance or support exempted from discharge by section 523(a)(5) is a question of federal bankruptcy law separate and distinct from state law, and any label given the obligation, whether by the parties or the state court, is not dispositive."); *Zaera v. Raff (In re Raff)*, 93 B.R. 41, 45-46 (Bankr. S.D.N.Y. 1988) ("A bankruptcy court is not bound by a state court's characterization. A bankruptcy court should not merely rely on language in a separation agreement or judicial decision to determine the nature of the obligation. A court should examine the intent behind the award and look to whether the assumption has the effect of providing support."); *Bonheur v. Bonheur (In re Bonheur)*, 148 B.R. 379, 382 (Bankr. E.D.N.Y. 1992) (Characterization . . . of the award by the divorce court or the parties is not, by itself, dispositive."). *See also Sculler v. Rosen (In re Rosen),* 151 B.R. 648, 653 (Bankr. E.D.N.Y. 1993); *Grassman v.*

*Grassman  (In re Grassman),* 156 B.R. 903, 907 (Bankr. E.D.N.Y. 1992); *Egan v. Lang (In re Lang),*
11 B.R. 428, 430 (Bankr. W.D.N.Y. 1981).

In this case, the unrebutted evidence compels the conclusion that the $240,000 payable
over ten years in fact constituted the parties' resolution of their dispute over equitable distribution of marital
property, namely, Duffy's medical practice.  The documentary evidence and the testimony of the debtor
and his attorney in the divorce proceedings, Edward Meyer, established two factual predicates irrefutably:
(1) Taback and Duffy went to trial on June 27, 1997 on only one single issue — the value, if any, for
equitable distribution purposes, of Duffy's property interest in his medical practice; and (2) Taback made
no claim in the divorce proceeding for alimony or maintenance.  The testimony of both Duffy and attorney
Edward Meyer was not questioned in any way by any contrary testimony or evidence and, in any event,
was found by this Court to be entirely credible and consistent with the circumstances, as the following
facts show.

Taback, not Duffy, decided in early 1993 that she wished to terminate her marriage to
Duffy and establish her relationship with Sheldon Taback.  She asked Duffy to leave the marital abode,
commenced the divorce action and within a year began full-time cohabitation with Sheldon Taback, whom
she married shortly after the divorce decree was entered in 1997.  Taback herself earned in the range of
$60,000 to $70,000 before commencing the divorce action and had the capacity to continue her profession
in the field of occupational therapy.  Although she was somewhat impaired by a long-term physical ailment
known as horn cell disease, she is not thereby disabled from physical activities such as skiing, and she
suffers no intellectual or mental impairment.  Sheldon Taback had income to support her both before and
after her divorce judgment from Duffy.  Moreover, alimony and maintenance payments generally if not
always terminate when the receiving ex-spouse cohabits with or remarries another person.  All of these
factors, together with Duffy's substantial support payments to Taback for his two children to which he had
agreed, explain the reason for the undisputed fact that Taback did not make any claim for alimony/

maintenance for herself in the divorce action.

       The documentary evidence confirms the foregoing, and also confirms the fact that the

parties proceeded to trial solely on the issue of equitable distribution of Duffy's medical practice.  Midway

through the divorce action the parties through counsel agreed to a Preliminary Conference Order dated

March 6, 1995 signed by Justice Hickman which stated that it was

       ORDERED, that the following issues remain unresolved:   _____

_____:

_____[handwritten] VALUATION OF MEDICAL PRACTICE_____
Whether O'Brien applies_____

_____;
and it is further

       ORDERED, that any issues with respect to fault, custody and finance not
specifically set forth above may not be subsequently raised in this action absent good
cause shown. . . .

It is significant that the words "VALUATION OF MEDICAL PRACTICE Whether O'Brien applies" are

handwritten in a blank space provided in the Order, and that the next paragraph makes clear that "any

issues with respect to . . . finance not specifically set forth above may not be subsequently raised. . . ."  In

fact, no "issues with respect to . . . finance," *i.e.*, no issue relating to alimony/maintenance, was ever

subsequently raised or litigated in the divorce action.

       Three months later, on June 27, 1995, in connection with a request for trial during early

October 1995, counsel for Duffy and Taback signed a Stipulation stating that the only issue to be resolved

was "equitable distribution" (handwritten).

       The divorce case finally came to trial in June 1997.  Justice Shapiro, a witness at the trial

before this Court, had no independent recollection of what happened at the trial before him in June 1997.

However, when shown the March 6, 1995 Preliminary Conference Order and the June 27, 1995

Stipulation, Justice Shapiro testified unequivocally that these documents limited the issues to be resolved

and would preclude the taking of evidence on the issue of alimony/maintenance.

The events at the trial were testified to by Duffy and his attorney, Edward Meyer, substantiated by Mr. Meyer's contemporaneous file memorandum dated June 30, 1997, and were not contradicted by any evidence.  The parties appeared before Justice Shapiro on June 27, 1997 prepared to try only the issue of equitable distribution of the value, if any, of Dr. Duffy's medical practice.  No claim for alimony or maintenance was made by Taback.  Both sides relied on expert witness reports and testimony on the issue of equitable distribution.   The written report of Taback's expert gave the opinion that $828,521 represented that portion of Duffy's enhanced earnings capacity applicable to his marriage to Taback.  Duffy's expert report concluded that because Duffy was only a staff doctor at three different medical service providers, in which Duffy had no proprietary interest, the value of Duffy's medical practice was nil because he had no practice that he could sell and was simply an employee.   In addition, Duffy was prepared to argue as a matter of fact and New York case law[3] that Taback made a negative contribution to his medical training, having engaged in persistent and various forms of marital misconduct, and that she made no financial contribution to Duffy's medical education, which was paid for in full by Duffy's father.   At the outset of the trial, however, Justice Shapiro granted Taback's motion to preclude the opinion and testimony of Duffy's expert, on the technical ground that the written report did not bear the signature of the expert who would testify at trial, over attorney Meyer's objection that the applicable Rule (22 NYCRR § 202.16(g)) contained no provision concerning signature.  Trial then commenced with the report and testimony of Taback's expert.  During Mr. Meyer's cross-examination of Taback's expert, Justice Shapiro called a recess and required the parties to discuss settlement.  In the course of off-the-record, *ex parte* discussions with each side, Justice Shapiro urged the parties to agree to Taback's settlement demand for a one time lump sum payment of $165,000 on her equitable distribution claim.  To this end he suggested that Duffy pay $240,000 spread over a number of years as the economic equivalent

---

[3]  Relying on *McSparron v. McSparron*, 87 N.Y.2d 275 (1995), *Blankenship v. Kerr*, 225 A.D.2d 645 (2d Dep't 1996) and *McAlpine v. McAlpine*, 176 A.D.2d 285 (2d Dep't 1991).

of $165,000 present value, and that the payments be designated as maintenance or alimony so that they would be deductible to Duffy, thereby reducing the cost of the settlement to him.  By the end of the day on June 27 the parties had negotiated an overall settlement along the lines suggested by Justice Shapiro, and it was embodied in the judgment of divorce subsequently signed by the Court and quoted, in pertinent part, above.

Thus, what actually happened at the trial on June 27, 1997 was that Duffy and Taback settled their dispute over equitable distribution of Duffy's property interest in his medical license or medical practice.  They did not settle a claim for alimony or maintenance, because no such claim was ever made.  The payments were designated as "spousal maintenance" and treated as such by the parties at the suggestion of Justice Shapiro, not for the purpose of providing alimony but in order to facilitate the settlement of Taback's equitable distribution claim by reducing the net cost to Duffy.  Unlike alimony/maintenance, the payments were to continue for ten years regardless of Taback's cohabitation (which long predated the divorce) or remarriage (which was contemplated to occur and did shortly after the divorce judgment).

There is no inconsistency, illegality or impropriety in Duffy's treating the payments as alimony for tax purposes and now arguing that the payments should be recognized as equitable distribution of a property interest for bankruptcy purposes.  Treating what was in fact a property settlement as alimony does not offend the tax laws since it merely reallocated the tax liability for the payments as between the parties.  It is true that Duffy benefitted by taking the tax deduction resulting from Justice Shapiro's suggestion to call the payments "alimony," but Taback also benefitted from the settlement, and the tax consequence was only one element of many financial and non-financial factors necessarily weighed by both sides in the give and take of reaching a settlement of their equitable distribution property dispute.  The settlement was acceptable to both and preferable to the alternative of proceeding with the trial, which would undoubtedly have been unpleasant for Taback in respect of Duffy's *McSparron* defense, uncertain

of outcome for both and potentially costly to both in terms of legal fees in the event of an appeal and a

potential new trial in the event of error.

      While there is case law suggesting that state court designation of matrimonial awards as

either alimony/maintenance payments or as equitable distributions should be afforded substantial deference,

even these cases are consistent with both the legislative history of the Bankruptcy Code and the cases

cited above.  The decision as to classification must ultimately rest in the hands of the bankruptcy court.

*See Forsdick v. Turgeon*, 812 F.2d 801, 802-03 (2d Cir. 1987) ("Although it is true that what constitutes

alimony, maintenance, or support, will be determined under the bankruptcy laws, not State law, it is also

true that Congress could not have intended that federal courts were to formulate the bankruptcy law of

alimony and support in a vacuum. . . . Thus, while the characterization of the award by the referee is not

determinative of the question, it is strongly indicative. . . ."); *Kerzner v. Kerzner (In re Kerzner)*, 250

B.R. 487, 494 (Bankr. S.D.N.Y. 2000) ("[T]he label given to [the award] by the Divorce Court, while not

controlling, should be given great weight.").

      In this particular case, the evidence shows that Justice Shapiro suggested that the

equitable distribution dispute be settled by calling the payments alimony solely to obtain preferential tax

treatment to make the settlement economically feasible for Duffy.  In *Kerzner*, Judge Lifland noted that

considerable weight is to be given to court orders precisely because "extraneous factors, such as business

or *tax considerations*, are less likely to affect court orders."  *Kerzner*, 250 B.R. at 494 (emphasis added)

(internal citations omitted).   The bankruptcy court is obligated under subsection (B) of Section 523(a)(5) to

consider the substance of a transaction and to disregard state court labels where appropriate.  This is

especially true where, as in the present case, Justice Shapiro based his suggestion not on the nature of the

payments themselves (Taback was not even seeking alimony) but instead on Duffy's ability to deduct the

payments on his income tax returns.

Taback's reliance on *Zaera v. Raff*, 93 B.R. 41 (Bankr. S.D.N.Y. 1988) as establishing a

bright line rule that "an award of a percentage of the present value of the medical degree is in the nature

of alimony and support and is non-dischargeable" is misplaced. *Raff*, 93 B.R. at 49. To the extent that

Judge Schwartzberg intended to establish a bright line rule to that effect, this Court declines to follow *Raff*.

It is clear under the leading New York State Court of Appeals decision in *O'Brien v. O'Brien*, 66 N.Y.

576 (1985) that a medical degree or medical practice is a property interest subject to equitable distribution

under New York domestic relations law. It is equally clear that, under the leading decisions of the Court of

Appeals for the Second Circuit in *Bieluch, Brody* and *Spong* in addition to the other cases cited above,

that the question of whether particular payments or obligations provided in a divorce decree constitute

alimony/maintenance within the scope of Section 523(a)(5) or equitable distribution of a property interest is

a question of bankruptcy law to be decided by the bankruptcy court based upon a consideration of all

relevant facts and circumstances. The bright line rule purportedly propounded in *Raff* cannot be

reconciled with the holdings of the New York State Court of Appeals in *O'Brien*, the Second Circuit Court

of Appeals in *Bieluch*, *Brody* and *Spong*, the many decisions which follow those rulings, and the statutory

mandate in Section 523(a)(5)(B) that subsection (5) does not apply to a debt "designated" by a state court

or the parties as alimony, maintenance, or support "unless such liability is *actually* in the nature of alimony,

maintenance, or support" (emphasis supplied).

However, *Raff* is more accurately read as exemplifying the methodology to be applied by

a bankruptcy court in determining whether an award is properly classified as alimony or equitable

distribution. Before concluding that the medical degree at issue in that case properly constituted alimony,

the court reiterated that a bankruptcy court should not merely adopt state court classifications without

further inquiry. *Raff*, 93 B.R. at 45-46 ("A bankruptcy court should not merely rely on language in a

separation agreement or judicial decision to determine the nature of the obligation. A court should examine

the intent behind the award and look to whether the assumption has the effect of providing support.").

*Raff* found that the state court had considered a number of factors in making its determination including the income of each party, the duration of the marriage and the probable future financial circumstances of both parties. *Raff* further found that in the case before it, the debtor's obligation was "intended to support the spouse after the divorce." These are all factors that *Raff* need not have analyzed if it intended to create a bright line rule.

Upon a consideration of all of the relevant facts and circumstances, I conclude as a matter of fact and law that the provision in the parties' divorce judgment for payment of $240,000 over ten years in $2,000 monthly payments, which resolved the only outstanding issue when the parties went to trial on June 27, 1997, constituted equitable distribution of a property interest not within the scope of Section 523(a)(5) of the Bankruptcy Code. Taback never sought alimony or maintenance in her divorce action against Duffy, and the designation of the payments as "spousal maintenance" was simply an economic mechanism suggested by the trial court which enabled the parties to reach a settlement of their property dispute.

**Section 523(a)(15)**

Section 523(a)(15) of the Bankruptcy Code excepts from discharge any debt

(15) not of the kind described in paragraph (5) that is incurred by the debtor in the course of a divorce or separation or in connection with a separation agreement, divorce decree or other order of a court of record, a determination made in accordance with State or territorial law by a governmental unit unless —

(A) the debtor does not have the ability to pay such debt from income or property of the debtor not reasonably necessary to be expended for the maintenance or support of the debtor or a dependent of the debtor and, if the debtor is engaged in a business, for the payment of expenditures necessary for the continuation, preservation, and operation of such business; or

(B) discharging such debt would result in a benefit to the debtor that outweighs the detrimental consequences to a spouse, former spouse, or child of the debtor;

There is no question that Duffy's remaining $74,000 obligation here in question constitutes a debt "in the course of a divorce" and also "in connection with a . . . divorce decree."  Accordingly, it is discharged under subsection (15) unless either subsection (A) or (B) applies.  The evidence is clear beyond argument that both subsections (A) and (B) apply.

### Subsection (A)

The test under subsection (A) is whether the debtor has "the *ability to pay* such debt from income or property of the debtor not reasonably necessary to be expended for the maintenance or support of the debtor. . ." (emphasis supplied).  As noted above, Duffy continued to pay his child support and "spousal maintenance" payments under the divorce judgment after he lost his medical license and his professional income until he had exhausted his savings and pension accounts.  Having exhausted his independent resources, and having barely enough income from his modest job to support himself, Duffy fell into arrears on his divorce judgment obligations.  By the time of the May 26, 2004 contempt hearing on Taback's motion to compel payment of the arrears by an order for incarceration, it appears that Duffy owed Taback $42,600.

There is no suggestion in the transcript of the May 26, 2004 contempt hearing that Duffy had not provided full disclosure of his earnings and financial capability.  Taback's attorney did not argue that Duffy had the assets or income to pay the monthly child support or "spousal maintenance" payments after he exhausted his savings and pension accounts, nor did she argue that his default was willful in the sense that he had the ability to pay but chose not to.

There was no suggestion in the transcript and no finding of fact by the state court that Duffy had any possibility of paying the $42,600 of arrears due as of May 26, 2004, either then or out of future income.  Nor did the state court find that Duffy had the ability to pay but chose not to after he exhausted his pension accounts.  As noted in footnote 1, above, the state court judge expressly

acknowledged that payment of the arrears by a garnishment or a wage deduction order would be futile. The May 26, 2004 transcript reveals that the state court's finding of "willfulness" (a prerequisite for an order of incarceration) was the court's finding of fact (whether or not predicated upon evidence at a trial) that Duffy must have intentionally done whatever he did that caused him to lose his medical license, and that this satisfied the element of willfulness requisite for incarceration.  It may or may not accord with the law in the State of New York to incarcerate a man in prison despite the fact that he did not have assets or income to pay an obligation as it accrued and had no possibility of paying the arrears on the date of the order for incarceration.   But what is relevant here under the Bankruptcy Code is that the state court clearly did *not* make a finding of willfulness in the sense of intentional failure to pay despite the ability to do so — to the contrary, the state court judge's findings on the record, quoted in footnotes 1 and 2, made clear that the court did not believe Duffy had the ability to pay.  As the state court judge's comment quoted in footnote 2 makes clear, the incarceration order was based upon the "possibility that family money may be available here, although I have no reason to think that it definitely would be available in this instance.  That may be the best perhaps the *only source* that [Duffy] would be able to go to in an effort to satisfy the arrearages." Transcript at 28 (emphasis supplied).  The fact that Duffy's father, who had no legal obligation to Taback or to Duffy, paid Taback the amount ordered by the court to keep his debtor-son out of prison does not change the uncontested fact that Duffy himself did not have the ability to pay.

Subsequent to May 2004 Duffy again fell into arrears on his divorce judgment obligations to Taback.  And once again Taback has brought a contempt proceeding seeking to incarcerate Duffy.  A hearing in the contempt proceeding was held on August 4, 2005 in Family Court of the State of New York, County of Putnam, before a support magistrate.  The transcript of the August 4, 2005 hearing and the support magistrate's August 12, 2005 Fact-Finding, Decision & Order were provided to this Court by Taback's counsel by letter dated August 19, 2005 for inclusion in the pretrial order, and these documents were offered and received in evidence as Exhibit DD and Exhibit CC, respectively.

The evidence presented at the August 4, 2005 hearing before the support magistrate was substantially the same as the evidence presented at the trial in this Court on August 29, 2005, and may be concisely summarized. Since the May 2004 contempt hearing, Duffy has worked for three different employers. The first was John Mini Indoor Landscaping, where Duffy was employed to take care of plants in office buildings, hotels and the like. His hourly rate at John Mini was $9 an hour, and he received a biweekly paycheck of approximately $350. During his employment with John Mini, Duffy also worked parttime for AMA TransAm, a medical transcription company. Duffy did editing work for AMA TransAm and earned gross pay of some $400 a month. In April 2005 Duffy obtained a fulltime job at MedQuist, another medical transcription firm, doing work editing transcriptions. He earns $14 an hour and earns gross pay of $2,400 a month, by far his highest income since he lost his medical license in 2002. He has requested a raise to $16 an hour, but has not received a response. Duffy lives with his fiancée in her apartment together with her children. He contributes $1,200 for rent, $250 to $300 a month for electricity, a little over $100 a month for telephone and Internet, $100 every several months for propane, $150 for car insurance and $200 to $250 for food. Duffy has a 1997 Volvo which is inoperable because he does not have the money to make necessary repairs. He has taken no vacation since 2001. He has no bank account, no other assets and no other income.

Subsequent to the May 2004 contempt hearing, it appears that Duffy used all of his available earnings (left over after paying his own reasonably necessary living expenses) to pay Taback in partial fulfillment of his child support obligations under the divorce decree. He ceased making child support payments at some point in early 2005 when his fiancée lost her job, which imposed upon him a greater share of the expenses necessary to support his and his fiancée's household. Duffy was not able to make his "spousal maintenance" payments subsequent to the May 2004 contempt hearing.

Thus, the parties agreed and the support magistrate found in her August 12, 2005 Fact-Finding, Decision & Order that Duffy's maintenance arrears totaled $30,000, his child support arrears were $26,288.36, and his obligation for unreimbursed medical expense and summer camp arrears were

$2,902.75, all accrued during the period from June 2004 through August 2005.  Based on her theory of

willfulness discussed in the next paragraph, the support magistrate also awarded judgment against Duffy

for Taback's legal fees of $8,533 in the contempt proceedings.

   Although one would have supposed that a critical issue before the family court at the

August 4, 2005 hearing was whether Duffy actually had the ability to pay his divorce judgment obligations

in the year and two months prior to the hearing, Taback's attorney did not argue that Duffy had such

ability, and the support magistrate made no such finding, nor could she in view of the evidence before her.

On the issue of "willfulness," the support magistrate concluded that she was bound under the doctrine of

*res judicata* to reach the same conclusion as the state court did at the May 26, 2004 contempt hearing —

that Duffy willfully did whatever he did that caused him to lose his medical license and professional income

and that his resulting inability to earn enough money to pay his debts was sufficient to satisfy the

"willfulness" requirement for incarceration.  Based upon this remarkable theory of "willfulness" (which

looks to the debtor's intent in some prior conduct that caused his poverty and ignores his actual inability to

pay) and on the fact that Duffy's father had the financial resources to pay $77,600 to cover Duffy's legal

fees and the purge amount to keep Duffy out of prison in May 2004, the support magistrate recommended

"that respondent [Duffy] be incarcerated for a period of three (3) months unless he pays the sum of

$30,000.00 on or before September 2, 2005 and payments of an additional $1,000.00 per month towards

arrears commencing October 1, 2005; and respondent's remaining current with respect to his current child

support and maintenance obligations until such time as all arrears are paid."   The support magistrate made

this recommendation despite the fact that the evidence before her demonstrated to a mathematical

certainty that Duffy had been incapable of keeping up with his child support and "spousal maintenance"

obligations in the prior fourteen months and that he cannot possibly pay the purge amounts set forth in her

recommendation.  Thus, her recommendation can only be predicated on the assumption that a third party,

Duffy's father, can once again be compelled to rescue his son from imprisonment despite the fact that the

father has no obligation to either Taback or his son.[4]   The support magistrate then referred the matter to

Family Court Judge Robert E. Miller and required the parties to appear before Justice Miller on

September 20, 2005 at 11:00 A.M.

The issue before this Court in this adversary proceeding is whether Duffy has "the ability

to pay [the $74,000 balance remaining on his $240,000 "spousal maintenance" debt to Taback] from

income or property of the debtor [Duffy] not reasonably necessary to be expended for the maintenance or

support of the debtor."   The evidence before this Court, which includes the transcripts of both the May 26,

2004 and August 4, 2005 hearings in the state court, establishes beyond doubt that since he lost his

professional income as a doctor and exhausted his savings and pension accounts Duffy has not had the

ability and does not now have the ability to pay both his child support and his spousal maintenance

obligations under the divorce judgment.  Duffy's accrued arrearages both before and since the May 26,

2004 contempt hearing were not willful or intentional in any sense of the words — he paid what he could

pay, and to the extent that he did not it was because he could not.[5]

Duffy's present gross income of $2,400 per month, the highest income he has earned since

he lost his medical license, is obviously grossly insufficient to pay more than $2,000 a month in child support

and another $2,000 in spousal maintenance, after paying his own modest and reasonable living expenses.

Neither the state court judge who signed the May 26, 2004 order for incarceration nor the support

magistrate who conducted the August 4, 2005 contempt hearing made any finding or heard any evidence

suggesting that Duffy had the ability to pay the divorce judgment arrears as they accrued.  Nor has Taback

offered any evidence or even argued in this adversary proceeding that Duffy had or has the ability to pay.

---

[4]    Duffy testified at the trial before this Court that his father has advised him unambiguously that he
will not pay any further arrears to Taback and that Duffy and Taback must work out their own
financial affairs consensually or through the courts.

[5]    I unequivocally reject the suggestion by Taback's attorney that Duffy's default should be deemed
willful because he could or should have obtained a better job after he lost his medical license in
2002.  A Yale degree does not guarantee financial success, and it is not easy to begin a new career
or get a well-paying job at age fifty.  Duffy's persistent efforts to find work and his good faith in
doing so and in trying to honor his financial obligation to Taback were amply demonstrated in the
trial record before me.

The test in subsection (A) has been met.

**Subsection (B)**

The test under subsection (B) of Section 523(a)(15) is whether "discharging such debt would result in a benefit to the debtor that outweighs the detrimental consequences to a . . . former spouse." Once again, Taback has not even contested the benefit/detriment test in subsection (B) in this adversary proceeding before this Court. On a gross income of just over $2,400 a month, Duffy can barely if at all support himself after paying more than $2,000 a month in child support. Despite his best efforts to pay every available dollar to Taback since the loss of his professional income and exhaustion of his other resources, Duffy has at Taback's instance been ordered to prison once and recommended for imprisonment a second time for his failure to make payments which he could not pay. The benefit to Duffy of being discharged from his $74,000 liability for "spousal maintenance" is palpable.

That benefit unquestionably outweighs the detriment to Taback of foregoing the $74,000 remaining on her $240,000 spousal maintenance entitlement. Taback and her husband Sheldon are both occupational therapists. Although she has chosen not to work since she began living with Taback in 1994, the adjusted gross income of the Tabacks for 2004 was $159,000. She drives a 2001 Lexus 300 RX, owns her own house individually (not jointly with her husband) with equity exceeding $110,000, has $17,000 in her individual savings account and has enjoyed annual ski vacations in Canada with her family for the last six years. Taback presented no evidence that her lifestyle has been materially affected by her failure to receive the divorce judgment payments since Duffy lost his ability to make those payments in 2002.

On the record before me, Taback continues to enjoy a comfortable and well-supported lifestyle, while Duffy lives a bare bones existence, incapable of both supporting himself and complying with his divorce judgment obligations, and threatened now for the second time with debtor's prison for not doing what he cannot do.

The test in subsection (B) has been met.

### Conclusion

For the reasons and under the authorities set forth in the discussion of Section 523(a)(5), above, I conclude as a matter of fact and law that the provision in the divorce judgment for ten-year payments designated "spousal maintenance" aggregating $240,000 in point of fact constituted the settlement of a dispute between the parties concerning solely equitable distribution of the debtor's property interest in his medical license and practice.   Since the dispute which was tried in the state court on June 27, 1997 concerned only equitable distribution, and since Taback made no claim for alimony/maintenance at or prior to the trial in the divorce action, the liability to pay $240,000 over ten years although designated "spousal maintenance" was not "actually in the nature of alimony, maintenance, or support" as required under Section 523(a)(5)(B).   Accordingly, the "spousal maintenance" obligation cannot be deemed alimony, maintenance, or support within the scope of Section 523(a)(5).

The support magistrate cited *In the Matter of Powers v. Powers*, 86 N.Y.2d 63 (1995) on the issue of willfulness in her August 12, 2005 report recommending incarceration and fee shifting upon a finding of willfulness.  In the *Powers* decision, Chief Judge Kaye stated:

> Willfulness requires proof of both the ability to pay support and the failure to do so (Family Ct Act § 455[5]).

86 N.Y.2d at 69.  The test of willfulness articulated by Chief Judge Kaye would appear to be similar to if not substantially the same as the test under Section 523(a)(15)(A), both hinging on "ability to pay."  Of course, the issue of "willfulness" under New York law for purposes of incarceration and fee shifting in the contempt proceedings is a matter of New York law which must be decided by the Family Court Judge at the hearing on September 20, 2005, and as to which this Court expresses no view.

However, for bankruptcy purposes under Section 523(a)(15)(A), on the basis of the uncontradicted evidence before me, summarized above, it is a mathematical certainty and I conclude as a matter of fact and law that Duffy did not have the ability to pay the arrears in his matrimonial obligations as they accrued either before or after the May 26, 2004 contempt hearing, and that Duffy does not have the ability to pay the $74,000 remaining unpaid on his $240,000 "spousal maintenance" obligation under the

divorce judgment.  I further conclude as a matter of fact and law under Section 523(a)(15)(B) that

discharging the $74,000 spousal maintenance obligation would confer a benefit on Duffy that far outweighs

any detriment to Taback.

Accordingly, the $74,000 spousal maintenance obligation is discharged.  Counsel for Duffy

will promptly submit an order and judgment in accordance with this decision.


Dated:  White Plains, NY
            September 16, 2005

                                                                    /s/ Adlai S. Hardin, Jr.
                                                                            U.S.B.J.